# United States Court of Appeals for the Federal Circuit

---

**INNOVENTION TOYS, LLC,**
*Plaintiff-Appellee,*

v.

**MGA ENTERTAINMENT, INC.,**
**WAL-MART STORES, INC., AND TOYS "R" US, INC.,**
*Defendants-Appellants.*

---

2010-1290

---

Appeal from the United States District Court for the Eastern District of Louisiana in Case No. 07-CV-6510, Judge Martin L.C. Feldman.

---

Decided: March 21, 2011

---

JAMES C. OTTESON, Agility IP Law, of East Palo Alto, California, argued for plaintiff-appellee.

MICHAEL A. NICODEMA, Greenberg Traurig, LLP, of Florham Park, New Jersey, argued for defendants-appellants. With him on the brief were MARK R. GALIS and KEVIN J. O'SHEA, of Chicago, Illinois.

---

Before RADER, *Chief Judge*, LOURIE, *Circuit Judge*, and WHYTE, *District Judge*.[*]

LOURIE, *Circuit Judge*.

MGA Entertainment, Inc.; Wal-Mart Stores, Inc.; and Toys "R" Us, Inc. (collectively, "MGA") appeal from the summary judgment decision of the United States District Court for the Eastern District of Louisiana that the asserted claims of U.S. Patent 7,264,242 ("the '242 patent") were infringed and were not invalid for obviousness. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 665 F. Supp. 2d 636 (E.D. La. 2009). Because the district court correctly found no genuine issues of material fact regarding infringement based on its construction of the claim term "movable," we affirm the court's grant of summary judgment of literal infringement. The district court, however, erred in several of its factual findings underlying its nonobviousness determination. We therefore vacate the court's grant of summary judgment of nonobviousness and remand.

BACKGROUND

I.

Innovention Toys, LLC ("Innovention") brought suit against MGA for infringement of the '242 patent, which claims a chess-like, light-reflecting board game and methods of playing the same. The disclosed game includes a chess-styled playing surface, laser sources positioned to project light beams over the playing surface when "fired," mirrored and non-mirrored playing pieces used to direct the lasers' beams, and non-mirrored "key playing pieces" equivalent to the king pieces in chess. *See*

---

[*] The Honorable Ronald M. Whyte, United States District Court for the Northern District of California, sitting by designation.

'242 patent col.2 l.64–col.3 l.35.  To play the game, players take turns either moving a playing piece to an unoccupied, adjacent square or rotating (reorienting) a piece within a square.  *Id.* col.3 ll.21-24; col.8 l.49–col.9 l.12. After moving or rotating a piece, a player then fires his laser, and if the laser's beam strikes the non-mirrored surface of a playing piece, that piece is eliminated from the game.  *Id.* col.3 ll.26-30; col.9 ll.13-17.  To win the game, a player must direct his laser beam to strike, or illuminate, his opponent's non-mirrored key playing piece, ending the game.  *Id.* col.3 ll.17-20; col.6 ll.44-47.

All the asserted claims, claims 31-33, 39-41, 43-44, 48-50, and 53-54, include a "key playing pieces" limitation in which the key pieces are "movable."  Claim 31 is representative:

A board game for two opposing players or teams of players comprising:

a game board, movable playing pieces having at least one mirrored surface, *movable* key playing pieces having no mirrored surfaces, and a laser source,

wherein alternate turns are taken to move playing pieces for the purpose of deflecting laser beams, so as to illuminate the key playing piece of the opponent.

*Id.* claim 31 (emphasis added).

MGA counterclaimed, denying infringement and alleging, *inter alia*, that the '242 patent was invalid under 35 U.S.C. § 103.  In making its obviousness argument, MGA relied on the combination of (1) two articles describing computer-based, chess-like strategy games, Laser Chess and Advanced Laser Chess (collectively, "the Laser Chess references"); and (2) U.S. Patent 5,145,182 ("the

Swift patent") describing a physical, chess-like, laser-based strategy game.

The Laser Chess game is described in an article entitled "Laser Chess™ First Prize $5,000.00 Winner Atari ST Programming Contest," published in the April 1987 edition of *Compute!*. J.A. 1775-78. Advanced Laser Chess is described in an article published in the Summer 1989 edition of *Compute!'s Amiga Resource*. J.A. 1784-87. Both articles disclose chess-like computer games with virtual lasers and mirrored and non-mirrored pieces, which are moved or rotated by players during alternating turns on a virtual, chess-like playing board. The goal of each game is to manipulate one's laser beam using the various game pieces to eliminate the other player's non-mirrored king piece by striking it with the laser beam. In Laser Chess, a player's king piece may move squares during game play: "[The king] can capture any opposing piece by moving onto its square." J.A. 1776. Similarly, in Advanced Laser Chess "Kings possess the ability to capture other pieces [by moving on top of them]." J.A.1784.

The Swift patent discloses a physical (rather than electronic) strategy game in which players take turns placing mirrored game pieces onto squares of a chess-styled game board. The players position the pieces so as to direct their laser's beam towards the opposing player's scoring module and away from their own. A player scores when his laser beam, having been deflected around the game board, strikes his opponent's scoring module. The scoring modules are mounted to the frame of the game board, *see* Swift patent col.2 ll.51-56, and thus are not physically capable of movement on the game board.

MGA's accused game, Laser Battle, is a physical board game for playing a chess-like strategy game.

Players take turns moving or rotating mirrored playing pieces so as to direct a laser beam to strike the opposing player's non-mirrored Tower playing piece to win the game. According to the rules of Laser Battle, in "Classic Game Play," the Tower pieces are placed on the board at the beginning of the game at one of various standard positions. J.A. 1986. Although the Towers are physically capable of movement on the game board, the rules provide that they "should always remain in their original positions on the board." J.A. 1985. However, the standard starting configuration illustrated in the rules show that the Tower pieces can be placed at different locations on the board, and the rules state that during "Advanced Game Play," the Towers need not remain in their standard positions. J.A. 1986.

## II.

On October 14, 2009, the district court ruled on the parties' cross-motions for summary judgment of infringement and invalidity. *Innovention Toys*, 665 F. Supp. 2d 636. The district court granted Innovention's motion for summary judgment of literal infringement. *Id.* at 647. The court first construed the claim term "movable" in light of the term's plain meaning as "capable of movement as called for by the rules of the game or game strategy." *Id.* at 644-45. In so holding, the court rejected MGA's more "cramped" construction that the movement must be "from space to space or by rotation within a single space." *Id.* at 643-45; *see also id.* at 644 n.15. The district court also rejected Innovention's broader construction of "movable" to mean "able to be moved, or possible to move," without any tie to the rules or strategy of the game. *Id.* at 642-43.

Based on its construction, the district court then found that the accused Laser Battle game's Tower pieces

met the "movable" claim limitation, the only disputed limitation. The court found that those key pieces were "moveable" when the players selected and "set up the game pieces in various start formations and layouts." *Id.* at 647 n.18. The court reasoned that even if "the instructions to Laser Battle suggest that its key pieces, the Towers, are not *supposed to be* moved during game play," they "are capable of movement . . . in that they fit into the recessed spaces on the board like the other pieces, and are capable of rotation within whatever recessed space a player may choose to place the Tower in for the start of game play." *Id.* at 646-47. The court also observed that although the instructions to Laser Battle note that "[t]he Towers should always remain in their original positions on the board," *id.* at 647 n.18, they also explain that "[e]xcept for Advanced Game Play, the Target Tower and the Laser Guns will remain in their standard positions in all formations," *see id.* at 647 n.18 & 19; J.A. 1986. This instruction suggests that the Tower pieces could be moved in Advanced Game Play because they fit in and are rotatable in the recessed spaces on the board.

The district court also granted Innovention's motion for summary judgment of nonobviousness. *Id.* at 655. The court first found that the Laser Chess references were non-analogous art because they described electronic, rather than real-world, laser games. *Id.* at 653. The district court then held that, because MGA had provided no evidence to support a finding as to the level of ordinary skill in the art, MGA's obviousness argument could be pursued only on the basis of what would have been obvious to a layperson. *Id.* at 654. The court then decided that because MGA had not provided any evidence that a layperson would have known of the Laser Chess articles or would have had any reason to modify the teachings of

the Laser Chess references, MGA had failed to state a *prima facie* case of obviousness. *Id.*

Finally, the court found that Innovention had demonstrated several secondary considerations of nonobviousness. These included (1) commercial success based on the sale of 140,000 games by Innovention, a small company with minimal marketing capabilities, and evidence that fans had started clubs and tournaments around the world; (2) long-felt need based on the game's sudden success and media praise; and (3) industry praise based on, *inter alia*, the game's nomination for Outstanding Technology of the Year by the International Academy of Science and its being one of five finalists for the Toy Industry Association's 2007 Game of the Year award. *Id.* at 654-55. In light of its summary judgment rulings, the district court granted Innovention's motion for a permanent injunction on January 13, 2010.

MGA appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

This court reviews a district court's decision on summary judgment *de novo*, reapplying the same standard applied by the district court. *Iovate Health Scis., Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1380 (Fed. Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### I.   Infringement

A determination of infringement involves two steps: First, the court determines the scope and meaning of the asserted patent claims. The court then compares the properly construed claims to the allegedly infringing

device to determine whether all of the claim limitations are present, either literally or by a substantial equivalent. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). The first step, claim construction, is a question of law, reviewed *de novo*. *Id.* (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*)). In contrast, infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). Accordingly, a court may determine infringement on summary judgment "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Id.*

On appeal, MGA does not argue that the district court erred in construing "movable" to mean "capable of movement as called for by the rules of the game or game strategy." Rather, MGA argues that the court improperly broadened its construction during the second step of the infringement analysis by adding capable of movement "during game set up," and thus erred in finding that Laser Battle's Tower pieces meet the "movable" limitation. Under the court's original construction, MGA asserts, Laser Battle's instructions definitively show that the Tower pieces are *not* to be moved, either from space to space or by rotation within a space, as part of the game's rules or strategy. Rather, MGA urges, the only way that the Tower pieces can be "movable" during game play or strategy is if the players ignore the game's rules and cheat. Moreover, according to MGA, because all the pieces must be moved onto the game board at some point, the district court's altered construction renders everything "movable" and the "movable" limitation superfluous.

Innovention responds that Laser Battle's Tower pieces are clearly "capable of movement"; each Tower piece is a

separate component that can be placed at any space on the game board and afterwards rotated within that space or moved to another space. In other words, Innovention argues, the Towers are "movable" since they are not permanently mounted to the game board as are the key playing pieces (scoring modules) disclosed in the Swift patent. Furthermore, according to Innovention, Laser Battle's instructions do not require the Tower pieces to remain stationary during all game play; the rules invite players to create "more intricate games" and tell players that the Towers "remain in their standard positions in all formations" except during "Advanced Game Play." J.A.1986-87.

We agree in main with the district court's infringement analysis,[1] and we affirm the district court's decision holding that MGA's Laser Battle game literally infringes the asserted claims of the '242 patent. During claim construction, the district court rejected MGA's narrower construction of "movable" in which "movable" was limited to the movements explicitly permitted by the rules of the game during game play, *i.e.*, movable from space to space or by rotation within a single space. *Innovention Toys*, 665 F. Supp. 2d at 642-43. Rather, the court embraced a definition that distinguished "movable" from "mounted" by contrasting the "movable key playing pieces" of the '242 patent with the fixed scoring modules of Swift. In

---

[1] The district court stated that even if the instructions suggest that the key pieces should not be moved, the capability existed, and this was dispositive of the infringement question. *Innovention Toys*, 665 F. Supp. 2d at 646-47. To the extent that this analysis implies that there would be infringement regardless of rules requiring particular placement of key pieces during game set up and prohibiting movement of those pieces regardless of the type of play, the analysis goes beyond that required for the disposition of the infringement question here.

particular, the district court stated that while the "key pieces disclosed in the Swift reference are permanently fixed to the game board and, therefore, cannot be moved prior to or during game play," the key pieces of the '242 patent "may be positioned in different spaces at the beginning of each game and can also be moved during game play." *Id.* at 644; *see also id.* at 644 n.15. Thus, the court's construction of "movable" includes the capability of being positioned in different spaces during set up (*i.e.*, at the beginning of each game) and the capability of being moved during Advanced Game Play. In other words, the Tower pieces "are capable of movement as called for by the rules of the game or game strategy."

Accordingly, MGA is incorrect when it argues that the district court expanded its construction of "movable" during the second step of the infringement analysis. The court's construction, not just its application, encompasses movement during game set up. Moreover, such a construction does not render "movable" superfluous, as MGA asserts, since it distinguishes the '242 patent's key pieces from the mounted scoring modules disclosed in Swift. Laser Battle's Tower pieces thus meet the "movable" limitation under the district court's consistent construction based on the pieces' undisputed ability to be physically positioned in different squares on the game board. No reasonable jury could find otherwise.

Although MGA contends that it does not dispute the district court's construction, implicit in MGA's argument is its disagreement with the construction of "movable" to mean *"capable* of movement." Because MGA does not challenge the district court's claim construction directly, but rather indirectly based on its application to the accused product, we will not review the district court's construction of "movable" to encompass the capability of movement. Accordingly, we affirm the district court's

decision granting summary judgment of literal infringement.

## II. Obviousness

Under the Patent Act, "[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). Although the ultimate determination of obviousness under § 103 is a question of law, it is based on several underlying factual findings, including (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, such as commercial success, long-felt need, and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). A patent is presumed valid, 35 U.S.C. § 282, and this presumption can be overcome only by clear and convincing evidence to the contrary. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

MGA argues that, rather than being nonobvious, the asserted claims would have been obvious based on the combination of the Laser Chess references, which teach the claimed game in electronic form, and the Swift patent, which teaches a physical laser-based game. According to MGA, the district court erred both (1) in concluding that because the '242 patent relates to a physical game, the Laser Chess articles were non-analogous art; and (2) in assuming that a person of skill in the art was a layperson rather than, as put forth by Innovention, a mechanical engineer with knowledge of optics. Finally, MGA argues, Innovention's unsupported and conclusory assertions of

secondary considerations fail to overcome MGA's *prima facie* case of obviousness.

Innovention responds that the Laser Chess references in combination with the Swift patent fail to teach or suggest every limitation of the asserted claims, and thus MGA has failed to state a *prima facie* case of obviousness. Specifically, Innovention argues that Swift, as MGA admits, fails to disclose movable key pieces and that the Laser Chess references fail to disclose any physical, non-virtual game components. Accordingly, Innovention argues that the Laser Chess references are non-analogous art because they are neither within the inventors' field of endeavor, *i.e.*, a non-virtual, three-dimensional, laser board game, nor reasonably pertinent to it. Innovention also argues that because MGA offered no evidence as to the level of skill in the art, the skill level defaults to that of a layperson, and that its evidence of secondary considerations provides further evidence that the claimed invention would not have been obvious.

We conclude that the district court clearly erred in several of the factual findings underlying its obviousness analysis. The district court erred in finding that the Laser Chess references fail to qualify as analogous art. The court also erred in concluding that the level of skill in the art is that of a layperson. We address each in turn.

## A. Analogous Art

A reference qualifies as prior art for a determination under § 103 when it is analogous to the claimed invention. *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992). "Two separate tests define the scope of analogous art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular

problem with which the inventor is involved." *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). "A reference is reasonably pertinent if . . . it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *Clay*, 966 F.2d at 659. "If a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection." *Id.* Whether a prior art reference is "analogous" is a question of fact. *Id.* at 658.

Innovention argues that the Laser Chess articles are non-analogous art because the '242 patent's inventors were concerned with making a non-virtual, three-dimensional, laser-based board game, a project that involves mechanical engineering and optics, not computer programming. The district court appears to have agreed, finding that the Laser Chess references were non-analogous art since each discloses "an electronic version of the '242 patent." *Innovention Toys*, 665 F. Supp. 2d at 653. The court, however, failed to consider whether a reference disclosing an *electronic*, laser-based strategy game, even if not in the same field of endeavor, would nonetheless have been reasonably pertinent to the problem facing an inventor of a new, *physical*, laser-based strategy game. In this case, the district court clearly erred in not finding the Laser Chess references to be analogous art based on this test as a matter of law. *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) (holding as a matter of law that prior art padlock seals were analogous since directed to the same problem of preventing the ingress of contaminants into the locking mechanism).

The '242 patent and the Laser Chess references are directed to the same purpose: detailing the specific game

elements comprising a chess-like, laser-based strategy game. Specifically, the '242 patent describes (1) the game's components, including the game board, '242 patent col.4 ll.45-56, and various types of playing pieces, *id.* col.6 l.48–col.7 l.24; (2) the game's specific rules, including how the pieces may move on the game board during a player's turn, *id.* col.3 ll.21-28, col.8 l.49–col.9 l.17; and (3) the game's ultimate objective, namely, illuminating an opponent's key playing piece with a laser beam, *id.* col.6 ll.45-47. The specification even distinguishes prior art patents based on these game elements, stating that U.S. Patent 3,516,671 lacks "the unique elements and rules of the ['242 patent's] invention," *id.* col.1 ll.47-50, and U.S. Patent 6,702,286 contemplates a game in which the objective is not to "illuminate playing pieces," but rather "to maneuver one's pieces to flank (or surround) those of the opposing player," *id.* col.2 ll.16-21.

The Laser Chess references likewise describe specific playing pieces, rules, and objectives to create a chess-like, laser-based strategy game. Both *Laser Chess* and *Advanced Laser Chess* disclose, for example, (1) various game pieces, each with unique capabilities, J.A. 1775-77, 1784-85; (2) rules for each player's turn, J.A. 1777-78, 1785-86; and (3) an ultimate objective of eliminating an opponent's king piece, J.A. 1775, 1784.

Accordingly, the '242 patent and the Laser Chess references relate to the same goal: designing a winnable yet entertaining strategy game. The '242 patent's specification confirms that game design was one objective facing its inventors. In particular, the specification states that "[s]trategy games may differ in a variety of ways," such as in board layout, the number and types of playing pieces, and the manner in which each piece moves on the game board, and that "[e]ach of these variations affects the strategy of the play and the degree of skill required to

play the game." '242 patent col.2 ll.19-46. The specification thus admonishes that if the game elements "are overly simplistic, the game is too easy, will usually end in a draw or a predictable manner, and quickly become uninteresting for the average player." *Id.* col.2 ll.49-54. Conversely, according to the specification, if the game elements "are overly complicated, the game takes too long to learn [and] is frustrating and uninteresting for the average player." *Id.* col.2 ll.57-60.

The specific combination of game elements disclosed and claimed in the '242 patent thus deals with the problem of game design, and game elements from any strategy game, regardless how implemented, "logically would have commended itself to an inventor's attention in considering [this] problem." *Clay*, 966 F.2d at 659. Basic game elements remain the same regardless of the medium in which they are implemented: whether molded in plastic by a mechanical engineer or coded in software by a computer scientist. And, as MGA's evidence shows, inventors of numerous prior art patents contemplated the implementation of their strategy games in both physical and electronic formats. *Innovention Toys*, 665 F. Supp. 2d at 650 n.23. For example, the Swift patent states that "[a]lthough the preferred embodiment is played by two players, obvious modifications of the game allow for . . . a single player playing against a computer." Swift col.2 ll.47-51. Thus, because no reasonable jury could find that the Laser Chess references do not qualify as analogous prior art, and the district court erred in not so concluding as a matter of law.

Because of its error, the district court failed to properly consider the scope and content of the relevant prior art as well as the differences between that art and the claimed invention, including whether one of ordinary skill in the art would have been motivated to combine the

teachings of the Laser Chess references with the Swift patent in light of the standard articulated in *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007). We therefore remand these factual determinations to the district court to consider in the first instance. Furthermore, should the district court conclude that MGA has made out a *prima facie* case of obviousness based on the Laser Chess articles and the Swift patent, the court must then determine whether Innovention's secondary considerations overcome MGA's *prima facie* case.

### B. Level of Skill in the Art

A determination of obviousness requires a factual finding of the level of ordinary skill in the art. 35 U.S.C. § 103(a); *Graham*, 383 U.S. at 17. Yet, a district court's failure to make a correct finding on the level of skill constitutes reversible error only where it affects the ultimate conclusion under § 103. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 963 (Fed. Cir. 1986). For example, no reversal is necessary where a district court makes a determination that an invention would have been obvious to one having the lowest level of skill, *i.e.*, a layperson, because what is obvious to a layperson is necessarily obvious to one with a higher level of skill in the field of the invention. *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1574 (Fed. Cir. 1986), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (*en banc*). Conversely, no reversal is necessary where a district court makes a determination of *non*obviousness based on a finding of the highest possible level of skill in the relevant art, as fewer inventions are obvious to a person with a lower level of skill than to one with a higher level of skill. *Id.* A less sophisticated level of skill generally favors a determination of nonobviousness, and thus the patentee, while a higher level of skill favors the

reverse. *See Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984).

In this case, the district court found that MGA had failed to provide any evidence of the level of skill in the art, and thus concluded that MGA's obviousness argument could be pursued only on the basis of what is obvious to a layperson. *Innovention Toys*, 665 F. Supp. 2d at 654. In so concluding, the district court erred. While MGA is permitted to argue that any level of skill, and thus the skill of a layperson, would suffice to support a holding of obviousness, the factual record in this case does not support such a finding. Here, Innovention conceded to the district court that the level of ordinary skill in the art was greater than that of a layperson. Specifically, Innovention asserted that the development of a three-dimensional game would not, in fact, be easy for the average layperson, as it took Innovention's game creators, a Ph.D. in mechanical engineering and two mechanical engineering students, a year and a half to develop and finalize Innovention's game, J.A. 1884 n.10, and that Innovention's patent reveals that the claimed invention requires an understanding of geometrical optics, J.A. 1885. The district court appeared to agree, stating that "it seems some knowledge of mechanical engineering or optics is required." *Innovention Toys*, 665 F. Supp. 2d at 654. The district court thus clearly erred in basing its obviousness analysis on what would have been obvious to a layperson notwithstanding evidence in the record and its apparent factual finding that one of ordinary skill in the art would possess a higher level of skill in the art.

Because the district court found nonobviousness based on an inappropriately low level of skill in the art, the error was not harmless. *Kloster*, 793 F.2d at 1574. Accordingly, on remand, the district court must make a

finding on the level of skill in the art and base its obviousness analysis on that level of skill.

### III. Permanent Injunction

The district court, based on its grant of summary judgment of infringement and nonobviousness, granted a permanent injunction to Innovention. Because we vacate and remand the district court's decision of summary judgment of nonobviousness, we also vacate the district court's permanent injunction.

### CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment of literal infringement, and we vacate and remand the district court's grant of summary judgment of nonobviousness.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED**